**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 4, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

JEANNE PAHLS; REBECCA WILSON;
ALMA ROSA SILVA BANUELOS;
CARTER BUNDY; JASON CALL;
MARY LOU "MITZI" KRAFT;
MERIMEE MOFFITT; LAURA
LAWRENCE; STUART T. "TERRY"
RILEY; CODEPINK WOMEN FOR
PEACE, Albuquerque Chapter; STOP
THE WAR MACHINE,

       Plaintiffs - Appellees,

v.

MATTHEW THOMAS; EDWARD
MIMS, in their individual capacities,

       Defendants-Appellants,

and

CITY OF ALBUQUERQUE;
ALBUQUERQUE POLICE
DEPARTMENT; KERRY SHEEHAN,
LESLIE BROWN, JOSHUA
MCDONALD, in their individual
capacities,

       Defendants.
_____

JEANNE PAHLS; REBECCA WILSON;
ALMA ROSA SILVA BANUELOS;
CARTER BUNDY; JASON CALL;
MARY LOU "MITZI" KRAFT;
MERIMEE MOFFITT; LAURA
LAWRENCE; STUART T. "TERRY"

No. 11-2055

RILEY; CODEPINK WOMEN FOR PEACE, Albuquerque Chapter; STOP THE WAR MACHINE,

   Plaintiffs - Appellees,

v.

KERRY SHEEHAN,

   Defendant-Appellant,

and

CITY OF ALBUQUERQUE; ALBUQUERQUE POLICE DEPARTMENT; MATTHEW THOMAS, EDWARD MIMS, LESLIE BROWN, JOSHUA MCDONALD, in their individual capacities,

   Defendants.

No. 11-2059

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:08-CV-00053-LH-ACT)**

---

Henry F. Narvaez of Narvaez Law Firm, P.A., Albuquerque, New Mexico, for Defendants-Appellants Thomas and Mims.

Edward Himmelfarb, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C. (Tony West, Assistant Attorney General; Kenneth J. Gonzales, United States Attorney, Albuquerque, New Mexico; Howard R. Thomas, Assistant United States Attorney, Albuquerque, New Mexico; Barbara L. Herwig, Appellate Staff, Civil Division, United States Department of Justice, Washington, D.C., with him on the briefs), for Defendant-Appellant Sheehan.

Christopher A. Hansen of American Civil Liberties Union, New York City, New York (Catherine Crump of American Civil Liberties Union, New York City, New York; Laura Schauer Ives of American Civil Liberties Union, Albuquerque, New Mexico; Philip B.

Davis, Albuquerque, New Mexico, with him on the brief), for Plaintiffs-Appellees.

Before **TYMKOVICH**, **MCKAY**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

Location, location, location. It is cherished by property owners and political demonstrators alike. Both groups, it turns out, are at the heart of this case. Plaintiffs-Appellees brought this action after law enforcement officials forced them to move to an unfavorable location to engage in protest activities but allowed a group espousing the opposite viewpoint to remain in place on private property—property that happened to be prime real estate for the political demonstration in question. They identified Defendants-Appellants Kerry Sheehan, Matthew Thomas, and Edward Mims as responsible for the decisions leading to this disparate treatment, and they claim each defendant is liable for viewpoint discrimination in violation of the First Amendment. The district court denied Defendants-Appellants' motions for summary judgment based on qualified immunity, and this interlocutory appeal followed. For the reasons set forth below, we reverse the judgment of the district court.

**I**

Our story begins in Los Ranchos de Albuquerque (hereinafter "Los Ranchos"), a semi-rural village in Bernalillo County, New Mexico, that neighbors the much larger city of Albuquerque. One of its main thoroughfares is a north-south route known as Rio

3

Grande Boulevard, which lies just east of, and parallels, the Rio Grande River. The river forms the western border of Los Ranchos.

On August 27, 2007, President George W. Bush attended a fundraiser for former Senator Pete Domenici at the home of Los Ranchos's mayor, Larry Abraham. The mayor's home is located to the west of Rio Grande Boulevard, between the road and the river. A long driveway runs west from Rio Grande Boulevard to the mayor's home. When President Bush arrived, his motorcade approached from the north, moving down Rio Grande Boulevard in a southerly direction, and made a right-hand turn into the mayor's driveway. This particular mode of entry gave rise to this lawsuit.

There were two groups of demonstrators awaiting the President's arrival that day. One group—which we shall call "protesters" or "Bush protesters," for their opposition to the President and his policies—was made to stand 150 yards south of the mayor's driveway on Rio Grande Boulevard, at a location called the southern checkpoint. A second group—which we shall call "supporters" or "Bush supporters," for their support of the President and his policies—was allowed to stand directly across from the mayor's driveway, on private property to the east of Rio Grande Boulevard, some six to fifteen feet from the roadway. The supporters were much closer to, and directly in view of, the President's motorcade as it entered the mayor's driveway. The protesters, by contrast, were much farther away, and their view of the motorcade—and, likewise, the President's view of them—was obstructed by police cars and horse-mounted officers situated at the

4

southern checkpoint.[1]

Among the protesters that day were Plaintiffs-Appellees.  (Henceforth, we call

them simply "plaintiffs.")  They later sued various government officials and entities

pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal*

*Bureau of Narcotics*, 403 U.S. 388 (1971), claiming a violation of their First and

Fourteenth Amendment rights.  They alleged that they were subjected to unconstitutional

viewpoint discrimination when local police officers and agents of the United States Secret

Service forced them to remain at the southern checkpoint and simultaneously allowed

Bush supporters to stand on private property north of the checkpoint in closer proximity

to the President's motorcade.

After discovery, Defendant-Appellant Kerry Sheehan, a Special Agent with the

---

[1]        An appendix to our opinion contains a helpful map of the site.  The parties unfortunately did not provide us a map.  However, based on the undisputed location of the President's visit, "[w]e take judicial notice of a Google map and satellite image as a 'source[] whose accuracy cannot reasonably be questioned'" for purposes of this case. *United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (second alteration in original) (quoting Fed. R. Evid. 201(b)); *see Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1218 n.2 (10th Cir. 2007) (taking judicial notice of an online distance calculation that relied on Google Maps data); *United States v. Piggie*, 622 F.2d 486, 488 (10th Cir. 1980) ("Geography has long been peculiarly susceptible to judicial notice for the obvious reason that geographic locations are facts which are not generally controversial . . . ."); *see also* David J. Dansky, *The Google Knows Many Things: Judicial Notice in the Internet Era*, 39 Colo. Law. 19, 24 (2010) ("Most courts are willing to take judicial notice of geographical facts and distances from private commercial websites such as MapQuest, Google Maps, and Google Earth.").  We do this here only to determine the "general location" of relevant events.  *Perea-Rey*, 680 F.3d at 1182 n.1.  The map in the appendix identifies the approximate location of the southern checkpoint—150 yards south of the mayor's driveway—based on Google Maps's "Distance Measurement Tool."  *Cf. Citizens for Peace in Space*, 477 F.3d at 1218 n.2.

5

United States Secret Service, moved for summary judgment on grounds of qualified immunity. Defendants-Appellants Lieutenant Matthew Thomas and Sergeant Edward Mims, officers with the Bernalillo County Sheriff's Department ("BCSD"), also filed summary-judgment motions asserting qualified immunity.[2] The district court denied summary judgment as to all of the officials, finding that they were not entitled to qualified immunity because there were "question[s] of fact" concerning both whether plaintiffs were subjected to viewpoint discrimination and whether each official personally participated in the alleged constitutional violation. Sheehan App. at 216, 219–22 (Mem. Op. & Order, filed Feb. 22, 2011).[3] Lt. Thomas and Sgt. Mims (jointly), followed by Special Agent Sheehan, filed separate notices of appeal from the district court's order. We have consolidated the two appeals for our review.

In ruling on the summary-judgment motions, the district court set forth in detail the factual background of this case. Generally, when a district court has denied qualified immunity at the summary-judgment stage, we must accept "as true" the district court's determination "that a reasonable jury could find certain specified facts in favor of the plaintiff," *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010), and our appellate jurisdiction is limited to the "'abstract' legal question[]" whether the facts as presented amount to a violation of a clearly established right, *id.* (emphasis omitted) (quoting

---

[2]     We are told that Lt. Thomas and Sgt. Mims have since been promoted to the ranks of captain and lieutenant, respectively. *See* Thomas/Mims Opening Br. at 8.

[3]     Throughout this opinion, we refer to the appendix filed by Special Agent Sheehan as "Sheehan App."

*Johnson v. Jones*, 515 U.S. 304, 317 (1995)).  Mindful of these limitations, we set forth in detail the events giving rise to this case.  *See generally* Sheehan App. at 191–210.

**A**

We begin with some relevant background.  The Secret Service has the statutory—and we may add, solemn—responsibility of protecting the President of the United States.  *See* 18 U.S.C. § 3056.  Whenever the President travels, the Secret Service is in charge of security, and it works with other federal agencies, as well as state and local entities, to design and implement security measures.

Before the President travels to a place, a Secret Service "advance team" visits the location to evaluate necessary security measures and develop a site-specific security plan.  The plan typically includes attack-prevention and emergency-response strategies, such as establishing a secure perimeter around the visit site and controlling vehicle access thereto.  Vehicle access is of particular concern to the Secret Service because it heightens the risk of attack by vehicle-borne explosives.  Security plans thus often incorporate portions of nearby roadways.  Pedestrian and vehicle movements along these roadways are controlled to ensure both the President's security and rapid, unobstructed access by emergency vehicles.

The advance team typically coordinates security efforts with local law enforcement and other public-safety officials.  Secret Service agents have no legal jurisdiction over local officials, and vice-versa, but all recognize that security is a team effort.  Local officers often defer to the Secret Service on issues of security, and the Secret Service, in

-7-

turn, often defers to local law enforcement on questions implicating local codes and ordinances, such as where demonstrators are legally allowed to stand. The Secret Service may nonetheless override law enforcement for safety reasons and may, for example, reposition demonstrators.

It is the general policy of the Secret Service to allow members of the public to walk along the shoulder of a vehicle-access route if they are legally allowed to be there, if they do not interfere with the President's motorcade, and if they do not pose a safety risk. If an individual is standing on private property near the visit site, the Secret Service will avoid infringing his or her property rights if possible. If that individual presents a security risk, however, the Secret Service has the authority to move him or her, property rights notwithstanding.

When President Bush visited Los Ranchos in August 2007, the Secret Service was in charge of overall security, and Special Agent Sheehan, as the "site agent," was tasked with designing and implementing the site security plan. Several days before the event, the Secret Service advance team met with local law enforcement and public-safety officials. Present at this meeting were, among others, Special Agent Sheehan, other Secret Service agents, and representatives from BCSD and the Albuquerque Police Department ("APD"). The purpose of the meeting, which was conducted by the Secret Service, was to coordinate the efforts of federal and local authorities in preparation for the President's visit.

The security plan that Special Agent Sheehan formulated established an inner

perimeter and an outer perimeter around the site of the President's visit. The inner

perimeter—i.e., the "security perimeter"—encompassed the mayor's residence and

adjacent property, including his driveway. Rio Grande Boulevard, lying to the east of the

mayor's property, fell outside of the inner perimeter. The Secret Service was responsible

for inner-perimeter security. Special Agent Sheehan supervised and monitored security

operations within the inner perimeter.

The outer perimeter consisted of points along Rio Grande Boulevard north and

south of the mayor's driveway. Because the boulevard was identified as a vehicle-access

route, the security plan established checkpoints along the outer perimeter to restrict

vehicle and pedestrian access to portions of the roadway near the mayor's driveway. One

such checkpoint was the southern checkpoint, located on Rio Grande Boulevard

approximately 150 yards south of the mayor's driveway. This particular location was

selected because it was far enough away from the driveway to mitigate the impact of

vehicle-borne explosives and because nearby areas were wide and flat enough to allow

for emergency-vehicle parking.

BCSD was responsible for outer-perimeter security during the President's visit.

Personnel from BCSD and APD were stationed along the outer perimeter, including at the

southern checkpoint, and they regulated vehicle and pedestrian access to portions of Rio

Grande Boulevard lying within the outer perimeter's boundaries.

Lt. Thomas was in charge of BCSD personnel for the event. Among other tasks,

he was responsible for making decisions regarding the treatment of demonstrators,

including where they would be permitted to stand. He was not required to consult with the Secret Service on every decision. Sgt. Mims's primary responsibility was security of the outer perimeter. He also had authority to decide whether to allow demonstrators beyond the southern checkpoint. If he had questions, he was to consult with his ranking officer, Lt. Thomas.

For events of this type, BCSD had in place a general policy of directing demonstrators to a designated protest zone. *See* Sheehan App. at 196 ("BCSD personnel were trained to direct demonstrators in such events to a designated protest zone because keeping them in one spot helps keep order, prevents interference with the motorcade, and helps ensure the safety of the President."). Pursuant to their responsibilities, Lt. Thomas and Sgt. Mims decided that all demonstrators who attended the event should be directed to gather at the southern checkpoint.

**B**

Early in the morning on August 27, 2007—the day of the President's visit—Sgt. Mims conducted a briefing for his deputies. He assigned certain deputies to positions along the outer perimeter, including at the southern checkpoint, and told them not to allow demonstrators to venture beyond the outer perimeter. He also instructed officers at the briefing to direct demonstrators to gather at the southern checkpoint. At least one officer left the briefing with the understanding that demonstrators would not be allowed to move north of the southern checkpoint even if they had been invited onto private property north of the checkpoint. Lt. Thomas also ordered officers under his command to

-10-

keep all demonstrators to the south.[4]  Residents were not subject to this requirement and were permitted to stay inside the perimeter.

As the morning progressed, many people, including plaintiffs, began arriving at the site to protest.  By picket signs, peace symbols, and apparel, their purpose was to express opposition to the President's policies, particularly the Iraq War.  They gathered on public property along Rio Grande Boulevard at both the northern and southern ends.  Law enforcement personnel had no reason to believe the protesters posed any threat to the President or the public.

**1**

Throughout the morning, various plaintiffs were subjected to the requirement to gather at the southern perimeter.  The district court highlighted three such incidents.

Plaintiff Jeanne Pahls arrived at the event site between 8:00 and 8:30 a.m., and she began walking along Rio Grande Boulevard north of the southern checkpoint.  Near the point where the mayor's driveway meets Rio Grande Boulevard, Ms. Pahls moved back and forth across the street several times, looking for a place to stand and protest.  It is worth pausing here and describing this area in greater detail because it becomes important

---

[4]     Lt. Thomas told his officers to allow demonstrators to go where they pleased but to keep all demonstrators in one group.  Once his subordinates, led by Sgt. Mims, concluded that the group of demonstrators should be kept to the south, the evidence would allow a reasonable jury to conclude that Lt. Thomas acceded in that determination.  *See* Sheehan App. at 218.  Indeed, at least one officer interpreted Lt. Thomas's keep-the-demonstrators-together directive to mean that all demonstrators were to be kept to the south.  *See id.* at 199–200, 218.

later.

Rio Grande Boulevard is a two-lane road with wide shoulders on either side. (Sgt. Mims estimated the shoulders' width at ten to fifteen feet.) A narrow part of each shoulder is tarmac and the rest gravel. Directly across from the mayor's driveway, lying to the east of Rio Grande Boulevard, is an open field. The field extends several yards north of the point where the mayor's driveway meets the boulevard, and extends eastward from the road to a bank of trees, behind which a private residence is nestled. The gravel shoulder of Rio Grande Boulevard meets the grassy western edge of the field in such a way as to suggest a demarcation of public property (the road and shoulder) from private property (the field). This demarcation line, of course, parallels Rio Grande Boulevard on its eastern side. *See generally* Appendix, *infra*.

As Ms. Pahls was crisscrossing Rio Grande Boulevard in this vicinity, a BCSD officer observed her, approached, and instructed her that demonstrators would be allowed to gather on the shoulder of Rio Grand Boulevard either north or south of the mayor's residence. Ms. Pahls decided to move north. She situated herself on the eastern shoulder of Rio Grande Boulevard, just north of the open field, near a line of trees marking the field's northern boundary. Plaintiffs Mary Lou Kraft and Laura Lawrence, as well as Ms. Lawrence's daughter, stood with Ms. Pahls at this location.

Later, a BCSD officer approached Ms. Pahls and her companions and told them that they could not stand there. Ms. Pahls protested, saying that another officer had given her permission to stand there. Several minutes later, more BCSD officers arrived and

-12-

instructed the women to move south. They complied and relocated to the southern perimeter.

Plaintiff Merimee Moffitt arrived at the site between 9:30 and 10:00 a.m. along with twelve to fifteen members of plaintiff CODEPINK. Initially, they stood on the shoulder of Rio Grande Boulevard at the southern perimeter, where most other demonstrators had gathered. At one point, Ms. Moffitt began walking north of the perimeter along the roadway to determine whether she could stand closer to the mayor's driveway. She encountered a group of protesters walking south along Rio Grande Boulevard. They informed her that she should turn back because no one was permitted to stand north of the southern perimeter.

After Ms. Moffitt rejoined the group to the south, she observed a white van drive past her location and back into a private driveway off of Rio Grande Boulevard. A woman in the van announced that she was there to ferry individuals north on Rio Grande Boulevard to a location on private property where they would have a better view of the motorcade. As protesters began to climb into the van, an unidentified BCSD officer approached and told the woman in the van that she could not park there. The woman explained that she was not parking and was only picking people up to take them to a friend's private property to the north. The officer responded that none of the other protesters could go up north and that no one, save the woman's daughter, could go with her. Those who had already entered the van got out, and the woman left.

When plaintiff Carter Bundy arrived at the site, he asked BCSD officers how close

to the mayor's driveway he and other protesters would be allowed to stand. BCSD officers told him that protesters could gather at the cross street south of the mayor's residence, some 300 yards from the mayor's driveway.

**2**

At some point prior to President Bush's arrival, an individual approached Special Agent Sheehan and identified himself as the owner of the property, including the open field, directly opposite the mayor's driveway, east of Rio Grande Boulevard. The landowner asked Special Agent Sheehan if he would be allowed to stand on the portion of his property adjacent to Rio Grande Boulevard in order to watch the President's motorcade as it passed. This area was beyond the inner security perimeter that was Special Agent Sheehan's principal responsibility that day. After satisfying himself that the landowner was not a security risk, Special Agent Sheehan told him that security officials would not interfere with his property rights so long as he did not interfere with the motorcade route or make any overt actions while the motorcade passed.

Soon after, a small group of supporters gathered in the open field across from the mayor's driveway. They stood either on the shoulder of Rio Grande Boulevard or on the grass near the shoulder, some six to fifteen feet from the roadway. The group hoisted American flags and a banner that read, "God Bless George Bush! We pray for you!"

A Secret Service agent—it is not clear who—informed Lt. Thomas and Sgt. Mims that a few individuals would be standing on private property across from the mayor's driveway. Lt. Thomas responded, "Fine." Sheehan App. at 204. He believed that a

-14-

citizen had a right to be on his or her private property. Although he never actually saw the supporters and did not know how far from the roadway they were standing, he relied on the agent's statement that they were on private property.

When Sgt. Mims was informed about the presence of the supporters, he was not in their vicinity. He did, however, speak with the supporters on more than one occasion that morning. He told them that as long as they remained on their own property, they would be permitted to stay. Sgt. Mims also believed that protesters, too, would have been allowed to stand on private property if they had been given permission to do so by the property owner or resident.

At some unknown time prior to the President's arrival, two Secret Service agents in a golf cart approached APD personnel stationed at the southern checkpoint and instructed them not to allow protesters to move farther north. These two Secret Service agents were not identified. Although Special Agent Sheehan was using a golf cart that morning, he never operated a checkpoint or directed the movement of pedestrians along Rio Grande Boulevard, and the district court concluded that "the evidence does not show that Special Agent Sheehan was one of the Secret Service agents personally telling APD officers at the southern checkpoint to stop pedestrians from walking north." *Id.* at 200 n.3.

**3**

Approximately thirty minutes prior to the President's arrival, according to standard protocol, law enforcement "harden[ed]" the outer perimeter—that is, they "no longer

-15-

allowed vehicular or pedestrian traffic through the checkpoints and other barricades." *Id.*

at 198 n.2. At or near the southern checkpoint, personnel from APD blocked Rio Grande

Boulevard with marked vehicles, and officers on horseback took up positions across the

roadway. Officers told the protesters there (numbering at least seventy at that point) to

form a line behind and parallel to the barricade, and not to step north of the line. Due to

the size of the horses bearing the mounted officers, the protesters' view of the mayor's

driveway was blocked. At the same time, additional law enforcement officers took up

positions in front of the supporters standing north of the checkpoint.

Around noon, President Bush's motorcade approached Mayor Abraham's

residence along Rio Grande Boulevard from the north and entered the driveway. The

motorcade never passed by the protesters at the southern perimeter, and the President's

view of these protesters was obstructed by distance and the police barricade. The

supporters in the open field,[5] by contrast, were up close and easily visible to the

_____

[5] There is some dispute about where precisely the supporters were standing
as the presidential motorcade drove by. Special Agent Sheehan, Lt. Thomas, and Sgt.
Mims all believed that the supporters were standing sufficiently far from the road to be on
private property. A declaration by Ms. Pahls and a later submission by plaintiffs' expert
suggested that the supporters were sufficiently close to the road to be on public property.
The district court found this dispute immaterial, stating that "[o]fficers need not know the
exact survey lines along an entire motorcade route in order to make distinctions between
private and public property along that route" and that "[o]fficers are not expected to have
expert knowledge in surveying" or "to have measuring tapes at their ready disposal to
make sure protestors stay within private or public property bounds." Sheehan App. at 214
n.9. We concur in this reasoning. Qualified immunity protects on-the-spot judgment
calls, even if they later turn out to be mistaken or ill-advised. *See Phillips v. James*, 422
F.3d 1075, 1080 (10th Cir. 2005) ("Qualified immunity protects all but the plainly

(continued...)

-16-

motorcade as it passed.

Following the President's arrival, the majority of protesters lingered for about fifteen minutes before dispersing. During the morning's demonstration, various media outlets had passed by the protesters. An article describing the protest appeared the next day in the *Albuquerque Journal*.

## C

Plaintiffs filed a complaint in January 2008, asserting claims pursuant to § 1983 and *Bivens* and alleging viewpoint discrimination by various government entities and five unnamed officials. Plaintiffs claimed that they received disparate treatment vis-à-vis the Bush supporters in violation of their First and Fourteenth Amendment rights. After extensive discovery, they moved to amend their complaint to include, among others, Special Agent Sheehan, Lt. Thomas, and Sgt. Mims as defendants in their individual capacities. The district court granted the motion. In September 2010, Special Agent Sheehan moved for summary judgment, invoking qualified immunity. Lt. Thomas and Sgt. Mims did the same in November 2010.

The district court denied summary judgment to all three officials. The court began by noting that it was "clearly established" that "disparate treatment of protesters based on

---

⁵(...continued)
incompetent or those who knowingly violate the law." (quoting *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001)) (internal quotation marks omitted)). Plaintiffs do not suggest that defendants are prevaricating or that their belief concerning the supporters' location was unreasonable. Accordingly, we, like the district court, proceed on the premise that the supporters were standing on private property.

their viewpoint [i]s unlawful." *Id.* at 212. The court went on to consider whether plaintiffs had presented evidence sufficient to raise issues of fact concerning disparate, viewpoint-based treatment. At this point, the court did not analyze the personal actions or personal liability of each defendant; it focused instead on "law enforcement" in the aggregate:

> The evidence construed in Plaintiffs' favor shows that law enforcement at the event interfered with the protestors' rights to demonstrate on the public shoulder across from and to the north of the Mayor's driveway and to go to private property north of the Mayor's driveway. In contrast, law enforcement did not interfere with the pro-Bush supporters' demonstration across from the Mayor's driveway, in view of the President's motorcade.

*Id.* at 213.

Defendants urged that their actions were based on both security concerns and respect for private-property rights, not the viewpoints of the assembled citizenry. With respect to the first rationale, they asserted that keeping demonstrators in one group enhanced security and ensured that limited manpower resources were effectively utilized. They further stated that the southern perimeter was selected as the gathering point because most of the protesters had already assembled there. With respect to the second rationale, defendants argued that some demonstrators were allowed to stand closer to the mayor's driveway because they were situated on private property, not because they were supporters of President Bush.

The court nonetheless found the evidence sufficient to suggest that these reasons were "pre-textual." *Id.* at 214. First, the court said, "[m]any of the protestors initially

-18-

'gathered' at the southern perimeter because law enforcement indicated to them that the southern perimeter was the only location permitted for demonstrating." *Id.* Furthermore, given that some demonstrators (the supporters) were allowed to stand north of the southern checkpoint, albeit on private property, the court was unpersuaded that security concerns justified barring other demonstrators (such as protesters like Ms. Pahls and her companions) from doing the same. In the court's view, protesters could easily have stood nearby on public property, such as on the eastern shoulder of Rio Grande Boulevard. That location, like the private property where the supporters stood, was outside the inner security perimeter that the Secret Service established and maintained. And even Special Agent Sheehan had admitted that, from a security standpoint, there was no reason to prevent demonstrators from walking along the eastern side of Rio Grand Boulevard north of the southern checkpoint. Regarding an argument of defendants related to depletion of manpower, the court noted that a separate group of officers had been stationed in front of the supporters, and there was evidence suggesting that additional manpower was present at the event but went unused.

The district court therefore concluded that "[a] reasonable jury could . . . conclude, based on the actions of law enforcement officers, that law enforcement harbored a discriminatory motive to target the anti-Bush demonstrators because of their message." *Id.* at 215. Again, however, the court did not specifically identify which members of law enforcement could be found to harbor this motive.

Having found that there was "a question of fact as to whether Plaintiffs' First

-19-

Amendment rights were violated," *id.* at 216, the court went on to consider each defendant's personal involvement in the alleged viewpoint discrimination. The court noted that plaintiffs were required to show that their rights were violated because of each official's "own individual actions," *id.* at 217, and further, that those actions were taken "*because of*[,] not merely in spite of, the demonstration's anti-Bush message," *id.* (alteration in original) (quoting *Moss v. U.S. Secret Service* (*Moss I*), 572 F.3d 962, 970 (9th Cir. 2009)) (internal quotation marks omitted).

The court began with Lt. Thomas. Highlighting his supervisory role over local officers and his assistance in developing the site security plan, the court wrote, "There is . . . evidence that [Lt. Thomas] ordered the officers under his command to keep demonstrators in one group south of the southern perimeter, yet he knowingly acquiesced in the decision not to interfere with the pro-Bush supporters who remained on or near their private property during the event." *Id.* at 218. That Lt. Thomas "may have deferred to Special Agent Sheehan's instruction that the pro-Bush supporters could remain on their private property" did not "absolve" Lt. Thomas of liability, the court said. *Id.* at 219.

> There is evidence that Defendant Thomas issued orders that caused his subordinate officers to not allow Plaintiffs to stand on public shoulders near the entrance to the Mayor's driveway or to protest on private property to the north of the Mayor's driveway, areas outside the security perimeter where they had a right to demonstrate. It is that disparate treatment, over which Defendant Thomas had direct control, that is the basis of his potential liability.

*Id.*

The court then turned to Sgt. Mims. It began by noting his supervisory role and

-20-

his authority to allow or not allow demonstrators through the southern checkpoint. The court also pointed out that Sgt. Mims "gave the briefing during which officers were instructed to move all protestors to the southern perimeter." *Id.* at 220. At the same time, Sgt. Mims "knew of and did not interfere with the pro-Bush supporters' demonstration across from the Mayor's driveway." *Id.* The court concluded that, given Sgt. Mims's active involvement in ordering the placement of demonstrators at the event, as well as the manner in which subordinate officers carried out his instructions, a jury could justifiably infer that he had engaged in viewpoint discrimination.

Finally, the court addressed Special Agent Sheehan. It highlighted his role as site agent in establishing the inner security perimeter around the mayor's residence and, together with local law enforcement, establishing checkpoints along the outer perimeter to restrict access to Rio Grande Boulevard. There was, however, "no evidence that Special Agent Sheehan specifically ordered local law enforcement to forbid protestors from moving north to private property or to force protestors south from the public shoulder across from the Mayor's driveway." *Id.* at 220. The district court nevertheless denied him qualified immunity. It explained that Special Agent Sheehan "participated in the briefing where Sgt. Mims instructed law enforcement officers to keep demonstrators to the south of the Mayor's residence," *id.*, and because of that participation, the evidence suggested both that Special Agent Sheehan "possessed responsibility for the continued operation" of a viewpoint-discriminatory policy and that he intended the disparate treatment of protesters and supporters, *id.* at 221–22.

-21-

Lt. Thomas and Sgt. Mims filed a timely notice of appeal from the district court's order. Later, Special Agent Sheehan filed a separate, timely notice of appeal. We have consolidated the two appeals for our review.

## II

Each official contends that the district court erred in denying him qualified immunity. We begin in this Part II by setting forth the relevant legal standards that will govern our decision; that includes the prerequisites for § 1983 and *Bivens* liability, for overcoming defendants' assertions of qualified immunity, and for establishing a First Amendment viewpoint-discrimination claim. In Part III, *infra*, we analyze the district court's decision, ultimately concluding that all three defendants are entitled to qualified immunity.

## A

Sometimes, in the course of performing their duties, public officials inflict injury. When they do, and when the injury is of constitutional dimension, officials may be liable in their individual capacities for damages. Injured plaintiffs have a number of avenues for recovery. One is 42 U.S.C. § 1983, which provides a cause of action against state officials who violate constitutional or other federally protected rights. *See Filiarsky v. Delia*, 132 S. Ct. 1657, 1660 (2012). A second avenue is a *Bivens* action—the federal analog to a § 1983 suit—which provides a "private action for damages against federal officers" who violate certain constitutional rights. *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)) (internal

quotation marks omitted).

The elements necessary to establish a § 1983 or *Bivens* violation "will vary with the constitutional provision at issue." *Id.* at 676; *see Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010); *id.* at 1209 n.2 (Tymkovich, J., concurring); *see also Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011). But common to all § 1983 and *Bivens* claims is the requirement that liability be predicated on a violation traceable to a defendant-official's "own individual actions." *Iqbal*, 556 U.S. at 676. As relevant here, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id.*

This personal-involvement requirement does not mean, however, that direct participation is necessary. As we recently recognized in *Dodds*, government officials may be held responsible for constitutional violations under a theory of supervisory liability. *See* 614 F.3d at 1199. "A plaintiff may therefore succeed in a § 1983 suit"—and, we may add, a *Bivens* action—"against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.*

Because § 1983 and *Bivens* are vehicles for imposing personal liability on government officials, we have stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants. "[I]t is particularly important" that

-23-

plaintiffs "make clear exactly *who* is alleged to have done *what* to *whom*, . . . as distinguished from collective allegations." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (alteration in original) (quoting *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1250 (10th Cir. 2008)) (internal quotation marks omitted). When various officials have taken different actions with respect to a plaintiff, the plaintiff's facile, passive-voice showing that his rights "were violated" will not suffice. Likewise insufficient is a plaintiff's more active-voice yet undifferentiated contention that "defendants" infringed his rights. *See Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532–33 (10th Cir. 1998); *see also Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011) ("The Complaint refers to actions of 'Defendants,' but that is not sufficient to show how Secretary Williams 'might be individually liable for deprivations of [Mr. Brown's] constitutional rights.'" (alteration in original) (quoting *Robbins*, 519 F.3d at 1250)). Rather, it is incumbent upon a plaintiff to "identify *specific* actions taken by *particular* defendants" in order to make out a viable § 1983 or *Bivens* claim. *Tonkovich*, 159 F.3d at 532 (emphases added); *see Lewis*, 604 F.3d at 1230 ("The record before us lacks any evidence suggesting *Dr. Tripp's* involvement in any of these . . . unlawful activities.").

The same particularized approach applies with full force when a plaintiff proceeds under a theory of supervisory liability. Various officials often have "different powers and duties." *Tonkovich*, 159 F.3d at 532. A plaintiff must therefore identify the specific policies over which particular defendants possessed responsibility and that led to the

alleged constitutional violation. *See Dodds*, 614 F.3d at 1203–04 (holding that the evidence showed Defendant "may have deliberately enforced or actively maintained the [unconstitutional] policies" and "Plaintiff has thereby presented facts that establish personal involvement by Defendant in the alleged constitutional violation sufficient to satisfy § 1983"); *see also Brown*, 662 F.3d at 1165–66 (ruling that complaint failed to state supervisory-liability claim under § 1983 because it failed to connect defendant to the allegedly unconstitutional policy).

Of course, in all cases, a plaintiff must show that each defendant acted with the requisite state of mind. *See Dodds*, 614 F.3d at 1200 (noting that *Iqbal* (which concerned *Bivens* liability) and § 1983 require plaintiffs to prove that "each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation").[6]

---

[6] We pause here to note a critical distinction between *Bivens* and § 1983. The latter is a statutorily conferred cause of action. The former is a cause of action implied directly under the Constitution. The Supreme Court "has been reluctant to extend *Bivens* liability to any new context or new category of defendants." *Iqbal*, 556 U.S. at 675 (quoting *Corr. Servs. Corp.*, 534 U.S. at 68) (internal quotation marks omitted); *see Minneci v. Pollard*, 132 S. Ct. 617, 622 (2012) (noting that since 1980 "the Court has had to decide in several different instances whether to imply a *Bivens* action" and that "in each instance it has decided against the existence of such an action"). And the Court has never held that a *Bivens* action is available against federal officials for a claim based upon the First Amendment. *See Iqbal*, 556 U.S. at 675 ("[W]e have declined to extend *Bivens* to a claim sounding in the First Amendment." (citing *Bush v. Lucas*, 462 U.S. 367 (1983))); *see also Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."). No argument was presented to us on the availability of a *Bivens* action for a First Amendment viewpoint-discrimination claim against a Secret Service officer actively engaged in protecting the President. We

(continued...)

**B**

Damages actions against public officials under § 1983 and *Bivens* impose "substantial social costs." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). They threaten potentially significant personal liability for actions that arise out of the performance of official duties, and they can subject officials to burdensome and distracting litigation. This could lead to undesirable *ex ante* effects: reticence of officials in carrying out important public functions and, perhaps worse, a general disaffection with public service, rooted in the calculation that its costs simply outweigh its benefits. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

To avoid these and other evils, the Supreme Court has recognized that public officials enjoy qualified immunity in civil actions that are brought against them in their individual capacities and that arise out of the performance of their duties. *See Anderson*, 483 U.S. at 638. "Qualified immunity is an immunity from suit rather than a mere defense to liability." *Lewis*, 604 F.3d at 1225 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (internal quotation marks omitted). And because it is "the norm" in private actions against public officials, officials enjoy a presumption of immunity when the defense of qualified immunity is raised. *Id.* (quoting *Harlow*, 457 U.S. at 807) (internal quotation marks omitted); *see Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011)

---

[6](...continued)
therefore need not and do not decide whether *Bivens* is available in these circumstances. We assume, for purposes of this case only, that it is. *See Reichle*, 132 S. Ct. at 2093 n.4.

-26-

("Law enforcement officers are, of course, entitled to a presumption that they are immune from lawsuits seeking damages for conduct they undertook in the course of performing their jobs."). A plaintiff seeking to overcome that presumption must make a two-part showing: first, that a public official violated the plaintiff's constitutional (or, in the case of a § 1983 action, more generally, federally protected) rights; and second, that these rights were clearly established at the time of the alleged violation. *See Lewis*, 604 F.3d at 1225; *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). This standard, by design, "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011).

Often, § 1983/*Bivens* liability and the defense of qualified immunity travel hand-in-hand, and when they do, we consider their substantive components together. *See Dodds*, 614 F.3d at 1193–94 ("Because a plaintiff can neither recover under § 1983 from a government official nor overcome the official's assertion of qualified immunity without demonstrating that [the] official violated his constitutional or statutory rights, the legal analysis required to surmount these separate obstacles is often related, if not identical."). Thus, although the requirement of personal participation, including the question of supervisory liability, is a component of liability under § 1983 and *Bivens*, we also incorporate it into our qualified-immunity analysis, where we ask whether a clearly established constitutional right has been violated. *See id.*; *see also al-Kidd v. Ashcroft*, 580 F.3d 949, 964–65 (9th Cir. 2009), *rev'd on other grounds*, 131 S. Ct. 2074 (2011).

Justice Thomas's dissent in *Hope v. Pelzer* articulates the principle well:

> In conducting qualified immunity analysis, . . . courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether each defendant's alleged conduct violated the plaintiff's clearly established rights. For instance, an allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct.

536 U.S. 730, 751 n.9 (2002) (Thomas, J., dissenting); *see also Dodds*, 614 F.3d at 1194 (quoting with approval this language from Justice Thomas's dissent in *Hope*).

In sum, building on our earlier discussion: To make out viable § 1983 and *Bivens* claims *and* to overcome defendants' assertions of qualified immunity, plaintiffs here must establish that each defendant—whether by direct participation or by virtue of a policy over which he possessed supervisory responsibility—caused a violation of plaintiffs' clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind. Plaintiffs must do more than show that their rights "were violated" or that "defendants," as a collective and undifferentiated whole, were responsible for those violations. *See Dodds*, 614 F.3d at 1194 (quoting *Hope*, 536 U.S. at 751 n.9 (Thomas, J., dissenting)) (internal quotation marks omitted); *Tonkovich*, 159 F.3d at 532–33. They must identify specific actions taken by particular defendants, or specific policies over which particular defendants possessed supervisory responsibility, that violated their clearly established constitutional rights. *See Tonkovich*, 159 F.3d at 532–33. Failure to make this showing both dooms plaintiffs' § 1983 and

*Bivens* claims and entitles defendants to qualified immunity.

The district court here denied qualified immunity to defendants at the summary-judgment stage, necessitating a few words on the scope of our appellate jurisdiction. Although typically a denial of summary judgment is not an appealable final order, we possess interlocutory jurisdiction when the district court denies qualified immunity at summary judgment. *See, e.g.*, *Fogarty v. Gallegos*, 523 F.3d 1147, 1153 (10th Cir. 2008). This is a limited jurisdiction, however, and we may review the denial only to the extent that it "turns on an issue of law." *Mitchell*, 472 U.S. at 530.

At this juncture, we generally "are not at liberty to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fogarty*, 523 F.3d at 1154 (citing *Johnson*, 515 U.S. at 316). That, instead, is "the district court's exclusive job." *Lewis*, 604 F.3d at 1225. Our task is restricted to reviewing legal questions—in particular, whether the district court's factual determinations, taken as true, "suffice to show a violation of law" and, further, "whether that law was clearly established at the time of the alleged violation." *Id.*[7]

---

[7] The rule of *Johnson*, 515 U.S. 304, is not absolute and admits of exceptions. *See Lewis*, 604 F.3d at 1225 (identifying "at least three"). One of these exceptions grows out of *Scott v. Harris*, 550 U.S. 372, 380–81 (2007), which permits us to disregard a district court's factual determinations when they are "utterly discredited by the record." Special Agent Sheehan points out in his reply brief that the district court denied him qualified immunity based upon the mistaken premise that he was present at Sgt. Mims's morning briefing on August 27. *See* Sheehan Reply Br. at 26 n.4. This contention has

(continued...)

**C**

As noted earlier, the elements necessary to establish a § 1983 or *Bivens* violation "will vary with the constitutional provision at issue." *Iqbal*, 556 U.S. at 676. Plaintiffs in this case have alleged viewpoint discrimination in violation of the First Amendment. At the core of the First Amendment is the idea that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). In traditional public forums, such as sidewalks and streets, a content-based regulation of speech must meet strict scrutiny. A content-neutral regulation, by contrast, must meet intermediate scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

A content-based regulation is one that is "based upon either the content or the subject matter of the speech." *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 536 (1980); *see also Ward*, 491 U.S. at 791 (asking "whether the

_____

[7](...continued)
some force. Our review of the summary-judgment record has uncovered no evidentiary basis for the district court's belief that Special Agent Sheehan attended the briefing. And astute readers will note that we did not include this fact (if it is a fact) in our description of events, *supra*, because the district court itself, in the "Factual Background" section of its own opinion, did not mention it. Furthermore, even plaintiffs did not contend in their pleadings before the district court that Special Agent Sheehan was at the briefing. *But cf.* Aplee. Br. at 14, 16, 44 (now so contending). Nevertheless, we need not decide whether this situation comes within the *Scott* exception. *Cf. Cooper v. Martin*, 634 F.3d 477, 480–81 (8th Cir. 2011); *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009). Special Agent Sheehan has stipulated to the district court's determination, mistaken though it may be, for purposes of this appeal. *See* Sheehan Reply Br. at 26 n.4. We therefore take it as true that he was at Sgt. Mims's morning briefing on August 27.

-30-

government has adopted a regulation of speech because of disagreement with the message it conveys").  A content-neutral regulation is one that is "justified without reference to the content of the regulated speech."  *Ward*, 491 U.S. at 791 (emphasis omitted) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)) (internal quotation marks omitted); *see Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 43 n.15 (10th Cir. 2013) ("A policy is content neutral if its restrictions do not hinge on either the viewpoint or the subject ma[tter] of the speech.").  In distinguishing between the two, "[t]he government's purpose is the controlling consideration."  *Ward*, 491 U.S. at 791.

Viewpoint discrimination is a subset—and a particularly "egregious form"—of content discrimination.  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *see Taylor*, 713 F.3d at 43 n.15 ("Subject matter regulation is 'not as obnoxious as viewpoint-based regulation,' but either form of content regulation raises constitutional concerns." (quoting *Hill v. Colorado*, 530 U.S. 703, 723 (2000))); *Ognibene v. Parks*, 671 F.3d 174, 192 (2d Cir. 2012) ("Viewpoint discrimination is a subset of content discrimination . . . .").  It occurs "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject."  *Rosenberger*, 515 U.S. at 829.  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Id.*  Both content- and viewpoint-based speech restrictions are presumptively invalid.  *See Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009); *Rosenberger*, 515 U.S. at 830–31; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992); *see also Hill*, 530

U.S. at 769 (Kennedy, J., dissenting) ("The Court time and again has held content-based or viewpoint-based regulations to be presumptively invalid.").

In § 1983 and *Bivens* actions, a claim of viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint-discriminatory purpose. *See Iqbal*, 556 U.S. at 676 ("Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose."); *Ward*, 491 U.S. at 791 ("[I]n determining content neutrality, . . . [t]he government's purpose is the controlling consideration."); *see also Collegians for a Constructive Tomorrow-Madison v. Regents of Univ. of Wisc. Sys.*, 820 F. Supp. 2d 932, 951 n.20 (W.D. Wis. 2011) ("[A] viewpoint-discrimination claim is a discrimination claim under the First Amendment, and so *Iqbal*'s requirement of actual discriminatory purpose applies."). When government officials target speech *because of* "particular views taken by speakers on a subject," viewpoint discrimination is afoot. *Rosenberger*, 515 U.S. at 829.

The purpose requirement is demanding, though. It "requires more than intent as volition or intent as awareness of consequences." *Iqbal*, 556 U.S. at 676 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (internal quotation marks omitted). "It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Id.* at 676–77 (alteration omitted) (quoting *Feeney*, 442 U.S. at 279) (internal quotation marks

-32-

omitted).[8]

In this case, for plaintiffs to prevail as to each defendant, they must show that the defendant's individual actions caused viewpoint discrimination to occur, and that those actions were taken "*because of*[,] not merely in spite of, [plaintiffs'] anti-Bush message." *Moss I*, 572 F.3d at 970. Under plaintiffs' supervisory-liability theory, they must show that each defendant adopted and implemented the security policies at issue, not for

---

[8]     In *Iqbal*, when it held that a claim of discrimination rooted in the First Amendment requires proof "that the defendant acted with discriminatory purpose," 556 U.S. at 676, the Supreme Court relied upon its earlier decision in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540–41 (1993). The *Iqbal* Court cited a portion of *Lukumi*—Part II.A.2—that commanded the views of only two Justices: Justice Kennedy (*Iqbal*'s author) and Justice Stevens. *See Lukumi*, 508 U.S. at 540–42. Justice Scalia, joined by Chief Justice Rehnquist, wrote separately in *Lukumi*, specifically declining to join Part II.A.2 of the opinion because it departed from a "focus on the object of the *laws* at issue to consider the subjective motivation of the *lawmakers*." *Id.* at 558 (Scalia, J., concurring in part and concurring in the judgment). In Justice Scalia's view, "it is virtually impossible to determine the singular 'motive' of a collective legislative body," and "[t]he First Amendment does not refer to the purposes for which legislators enact laws, but to the effects of the laws enacted." *Id.*

We do not read *Iqbal* as establishing that Part II.A.2 of the *Lukumi* opinion *as such* now represents the view of a majority of the Justices. Rather, we read *Iqbal* as saying that in the *Bivens* and § 1983 context, where liability is to be imposed upon an *individual* defendant for discrimination in violation of the First Amendment, a plaintiff must prove a discriminatory purpose, supported by evidence of the defendant's subjective motivations. Outside the *Bivens* and § 1983 individual-liability context, however, we believe that what we said in *Colorado Christian University v. Weaver* remains good law: "Under *Lukumi*, it is unnecessary to identify an invidious intent in enacting a law—only Justices Kennedy and Stevens attached significance to evidence of the lawmakers' subjective motivation." 534 F.3d 1245, 1260 n.7 (10th Cir. 2008) (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1234 n.16 (11th Cir. 2004)) (internal quotation marks omitted); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1131–33 (9th Cir. 2009); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 168 n.30 (3d Cir. 2002); *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1292 & n.3 (7th Cir. 1996).

-33-

viewpoint-neutral reasons, "but for the purpose of discriminating on account of" the particular message plaintiffs wished to convey. *Iqbal*, 556 U.S. at 677; *see also Moss v. U.S. Secret Serv.* (*Moss II*), 675 F.3d 1213, 1225 (9th Cir. 2012) (holding that plaintiffs sufficiently stated a First Amendment viewpoint-discrimination claim when they alleged in their complaint that Secret Service agents relocated protesters with the "impermissible motive of shielding the President from those expressing disapproval of him or his policies"), *amended on other grounds by* 711 F.3d 941 (9th Cir. 2013).

**III**

In light of the principles we have articulated above, we must decide whether the district court properly denied qualified immunity to Special Agent Sheehan, Lt. Thomas, and Sgt. Mims on plaintiffs' viewpoint-discrimination claim. We hold that the district court erred and that defendants are entitled to qualified immunity. More specifically, we hold that the evidence does not demonstrate that any of the defendants violated plaintiffs' constitutional rights. *See Lewis*, 604 F.3d at 1225.

In Part III.A, *infra*, we assess the first half of the district court's legal discussion, where it analyzed the presence *in the abstract* of a constitutional violation. We conclude that this analysis, because it analyzes defendants' liability as a collective whole, does not comport with the requirements for imposing personal liability on government officials under § 1983 and *Bivens*.

The district court did go on to analyze each defendant's personal involvement in the alleged viewpoint-discriminatory practices, and we review that portion of the district

court's decision in Part III.B, *infra*. We determine that the evidence, at most, shows that each defendant was aware of the disparate treatment to which plaintiffs were subjected. This evidence is insufficient as a matter of law to show that any defendant promulgated the policies at issue or acted for a discriminatory purpose. Each defendant is therefore entitled to qualified immunity.

## A

We begin with the district court's opening discussion of whether plaintiffs had adequately shown a constitutional violation. In the first half of its legal analysis, the district court determined that a reasonable jury could conclude that "law enforcement" had subjected plaintiffs to disparate treatment, Sheehan App. at 213, and that "law enforcement harbored a discriminatory motive to target the anti-Bush demonstrators because of their message," *id.* at 215. The court therefore concluded that the evidence construed in plaintiffs' favor showed that "Plaintiffs' First Amendment rights were violated." *Id.* at 216.

The district court's mode of analysis, however, runs clearly afoul of the standards that must be met if plaintiffs are to make out viable § 1983 and *Bivens* claims and overcome defendants' assertions of qualified immunity. Liability under § 1983 and *Bivens* requires personal involvement. *Iqbal*, 556 U.S. at 676. Plaintiffs must establish that *each* defendant caused plaintiffs to be subjected to viewpoint discrimination and acted with a viewpoint-discriminatory purpose. The district court must conduct a differentiated analysis. At the summary-judgment stage, it must identify in the record

-35-

evidence the specific actions or policies for which each defendant is allegedly responsible and the evidence bearing on each defendant's state of mind, and then determine (as to each defendant) whether the evidence is sufficient to go to a jury. *See Dodds*, 614 F.3d at 1200, 1203–04; *see also Tonkovich*, 159 F.3d at 532–33.

The district court failed to do this here. The court's determinations that "law enforcement" subjected plaintiffs to disparate treatment, Sheehan App. at 213, that "law enforcement harbored a discriminatory motive" against plaintiffs, *id.* at 215, and that plaintiffs' First Amendment rights "were violated," *id.* at 216, do not suffice to show personal involvement by any individual defendant in viewpoint discrimination and cannot, of themselves, overcome defendants' qualified immunity. *See Dodds*, 614 F.3d at 1194 ("In conducting qualified immunity analysis . . . , courts do not merely ask whether, taking the plaintiff's allegations as true, the plaintiff's clearly established rights were violated. Rather, courts must consider as well whether *each defendant's* alleged conduct violated the plaintiff's clearly established rights." (emphasis added) (quoting *Hope*, 536 U.S. at 751 n.9 (Thomas, J., dissenting)) (internal quotation marks omitted)).

Plaintiffs insist, on the authority of our decision in *Fogarty*, that we are "not at liberty to review" these factual determinations by the district court. Aplee. Br. at 26 (quoting *Fogarty*, 523 F.3d at 1154) (internal quotation marks omitted). They argue, for example, that we must accept the district court's conclusions as to "pretext" and its consequent determination that a reasonable jury could infer that defendants acted with a viewpoint-discriminatory purpose. We disagree for two reasons.

First, while our limited interlocutory jurisdiction requires that we ordinarily accept as true the district court's factual determinations, we may review the district court's denial of qualified immunity "to the extent that [it] turn[s] on an issue of law." *Dodds*, 614 F.3d at 1191 (quoting *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1152 (10th Cir. 2010)) (internal quotation marks omitted). It follows that if the district court commits *legal* error en route to a *factual* determination, that determination is thereby deprived of any special solicitude it might otherwise be owed on appeal. In such an instance, the factual determination is predicated on an erroneous legal conclusion, and because we may review the latter, we need not accept the former as true. *Cf. Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984) ("Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law."); *Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1477 (10th Cir. 1993) ("Although we review the court's factual determination of the amount of damages under the clearly erroneous standard, '[w]e are not so constrained . . . when the trial court's computation of damages is predicated on a misconception of the governing rule of law.'" (alteration in original) (quoting *Chapparal Res., Inc. v. Monsanto Co.*, 849 F.2d 1286, 1289 (10th Cir. 1988))).

Second, plaintiffs' argument misses the point. Our job in this appeal is to consider the legal question whether the facts that a reasonable jury could find suffice to show a

constitutional violation. *Lewis*, 604 F.3d at 1225. But even if we accept that "law enforcement" was responsible for plaintiffs' disparate treatment and that "law enforcement" acted with a viewpoint-discriminatory purpose, those facts would not suffice as a matter of law to show that any *individual* defendant violated the First Amendment. *See id.* at 1226–27 ("The problem with th[e district court's] discussion is that it doesn't tell us what [the defendant] did or where, when, or why he took any action that might have violated [the plaintiff's] Fourth Amendment rights."); *Tonkovich*, 159 F.3d at 532 ("[T]he district court's conclusion is infirm because it lumps all of 'these defendants' together despite the fact that each of the defendants had different powers and duties and took different actions with respect to [the plaintiff]."); *see also Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011) ("The district court was simply incorrect in its conclusion that [the plaintiff's] testimony about complaints to *unidentified* corrections officers created a genuine issue of material fact as to whether [the plaintiff] reported abuse to the defendants in this case. . . . Determining whether a defendant is entitled to qualified immunity requires an individual assessment of the knowledge of that defendant." (emphasis added)).

Liability under § 1983 and *Bivens*, and defendants' entitlement to qualified immunity, turn on an individual assessment of each defendant's conduct and culpability. It is that inquiry that we must now undertake.

**B**

Significantly, there were two sets of decisionmakers and two sets of policies in

-38-

play on the day in question. The first decisionmaker was Special Agent Sheehan. As the site agent, he was responsible for establishing the security plan for the President's visit. The plan included an inner perimeter and outer perimeter, as well as the southern checkpoint. On the day of the President's visit, Special Agent Sheehan's primary responsibility was the security of the inner perimeter. Outer-perimeter responsibilities were assigned to BCSD. As he was carrying out his duties, Special Agent Sheehan was approached by a property owner who requested permission to engage in a political demonstration from his private property. Secret Service policy strives to honor speech on private property. Consistent with that policy, Special Agent Sheehan acceded to the request.

The second set of decisionmakers consisted of Lt. Thomas and Sgt. Mims. They assisted Special Agent Sheehan in establishing the security plan at the visit site, and their primary responsibility on the day in question was outer-perimeter security, including operation of the southern checkpoint. For events of this type, BCSD policy favors directing demonstrators to a single location and keeping them in one group. According to the district court, this policy was in place because it "helps keep order, prevents interference with the motorcade, and helps ensure the safety of the President." Sheehan App. at 196. Consistent with that policy, Sgt. Mims told his deputies at the morning briefing to direct demonstrators to the southern checkpoint, and Lt. Thomas gave similar orders to his subordinates. The move-south directive applied to all demonstrators—but not residents—whether or not they wished to stand on public or private property.

-39-

Two sets of decisionmakers, two different policies. But they came together that morning to create the perfect First Amendment storm. As Lt. Thomas and Sgt. Mims carried out the move-south policy—forcing all demonstrators to the south and declining to draw a public-private property distinction—Special Agent Sheehan decided to allow one group of demonstrators to remain north on private property. The move-south policy affected only Bush protesters. Special Agent Sheehan's decision affected only Bush supporters. The upshot was disparate treatment of two different viewpoints. But was it viewpoint discrimination?

**1**

We begin by noting that neither the Secret Service's general policy of avoiding interference with speech on private property nor BCSD's general policy of keeping demonstrators in a single group is itself a content- or viewpoint-based restriction on speech. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1128–29 (9th Cir. 2005) (reviewing the content-neutrality of a speech regulation as a question of law). The Secret Service's policy is content- and viewpoint-neutral on its face. It draws no distinctions based upon the content of the speech or the viewpoint of the speaker, and there is no reason to think that, in application, it would tend to "favor some viewpoints or ideas at the expense of others." *City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984). After all, expressions of protest are just as likely to emanate from private property as are expressions of support. *See, e.g.*, *Jones v. Parmley*, 465 F.3d 46, 52 (2d Cir. 2006) (Sotomayor, J.). Furthermore, because "First Amendment protections . . . are especially

strong where an individual engages in speech activity from his or her own private property," *id.* at 56, the Secret Service's policy manages in a single stroke to honor two of our nation's best traditions: freedom of speech and property rights. *See City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) ("A special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to *speak* there." (citation omitted)); *Taxpayers for Vincent*, 466 U.S. at 811 (concluding that a city's ban on speech on public property, which did not extend to speech on private property, did not raise First Amendment concerns because "[t]he private citizen's interest in controlling the use of his own property justifies the disparate treatment"); *Warner v. City of Boca Raton*, 64 F. Supp. 2d 1272, 1291 (S.D. Fla. 1999) ("[T]he government has broader power to regulate expression on public property [than on private property]." (citing *Gilleo*, 512 U.S. at 58)); *see also Messiah Baptist Church v. Cnty. of Jefferson*, 859 F.2d 820, 829 n.3 (10th Cir. 1988) (McKay, J., dissenting) ("[T]he Government interest in controlling public property is greater than its interest in controlling private property. At stake in the instance of private property is the individual's interest in speech, assembly, free exercise, property, and the uses to which their own land may be put.").

BCSD's policy, too, is content- and viewpoint-neutral on its face. Requiring political demonstrators to remain in one group when the President comes to town does not favor any one group or message over another. The same is true of a total ban on demonstration activities within a defined geographic area, even if that area includes both

public and private property. *See Citizens for Peace in Space*, 477 F.3d at 1220 (recognizing that establishment of security zone for NATO conference was content-neutral because it "drew [no] distinction based on the content of speech" and "implemented a total ban on public expression within the security zone, regardless of the identity of the speaker or the subject of the message"); *Menotti*, 409 F.3d at 1129 (evincing that establishment of a security zone for an international trade conference was content-neutral because "persons could not protest—in support of or against—*any* topic within the restricted zone"). Also, the fact that the move-south policy permitted residents, but not demonstrators, to remain within the area encompassed by the outer perimeter does call into question the content or viewpoint neutrality of BCSD's policy. *See Citizens for Peace in Space*, 477 F.3d at 1218 (noting that security zone was content-neutral even though "delivery and repair persons servicing the private residences were allowed to enter and leave the security zone, as well as social guests of the residents living in the twenty-two homes, all of them passing through security at Checkpoint 1").

The rub of this case is that these two viewpoint-neutral policies came together and were implemented in such a way as to produce a viewpoint-discriminatory effect. And plaintiffs contend not only that this effect is traceable to each defendant's actions and decisions, but also that each defendant intended the ultimate, disparate result—in other words, that each defendant is liable for viewpoint discrimination.

Further complicating matters is the fact that the government officials responsible for these policies hail from different government agencies—indeed, from different

-42-

government sovereigns.  This has consequences for our First Amendment analysis in general.  *Cf. Lukumi*, 508 U.S. at 535 (holding that three different ordinances passed by a single government actor, "when considered together," were a clear "attempt to target petitioners and their religious practices").  It also matters to our analysis under *Bivens* and § 1983.

As we have said, under § 1983 and *Bivens*, a public official is liable only for his own misconduct.  *Iqbal*, 556 U.S. at 676; *Dodds*, 614 F.3d at 1200.  And his liability in a supervisory capacity can be predicated only on a policy over which he possessed "superintendent responsibilities."  *Iqbal*, 556 U.S. at 667.  This requires our attentiveness to the "different powers and duties" of different government officials, *Tonkovich*, 159 F.3d at 532, especially when their authority derives from different sources and, as here, different sovereigns.  *See Kline v. N. Tex. State Univ.*, 782 F.2d 1229, 1235 (5th Cir. 1986) (emphasizing officials' differing lines of authority within university and granting them qualified immunity because no official was in a supervisory position over the individual who harassed plaintiff).

Here, it is plain that neither Lt. Thomas nor Sgt. Mims was Special Agent Sheehan's supervisor; nor were they his subordinates.  These two sets of officials were coequals on the day in question, and neither was in the other's de jure or de facto chain of command.  *See* Sheehan App. at 193 ("[T]he Secret Service does not have jurisdiction over a local police officer . . . .").  *See generally Printz v. United States*, 521 U.S. 898, 918–22 (1997) (discussing our nation's system of "dual sovereignty" and the distinctions

-43-

between the federal government and state officers (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)) (internal quotation marks omitted)).  Equally plain is that, although all officials were cooperating in a joint effort to secure the President's safety, there were different government policies in play, and each official's actions were consistent with his own agency's policy.

Our fact pattern, then, is a unique one: Two different but coequal sets of government actors, each acting consistently with different agency policies in the course of implementing a single, overall security plan, produced a disparate impact on plaintiffs' speech.  For this kind of situation, we must address what is required of plaintiffs to show viewpoint discrimination.

Beyond doubt, disparate impact alone is not enough to render a speech restriction content- or viewpoint-based.  *See Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) ("[T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based."); *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 93–94 (2d Cir. 2003) ("[V]iewpoint disparity, standing alone, does not constitute proof of viewpoint discrimination.").

The Supreme Court has made clear that, for a discrimination claim rooted in the First Amendment, a plaintiff must show that a government official "acted with

discriminatory purpose." *Iqbal*, 556 U.S. at 676 (citing *Lukumi*, 508 U.S. at 540–41));
*see Ward*, 491 U.S. at 791 (asking "whether the government has adopted a regulation of speech because of disagreement with the message it conveys"); *McGuire v. Reilly*, 386 F.3d 45, 63 (1st Cir. 2004) ("Unless government actors were to intentionally enforce the statute unequally, then any evidence of inequality that plaintiffs were to show would merely indicate a disproportionate burden that would not signify viewpoint discrimination." (alterations omitted) (quoting *McGuire v. Reilly*, 260 F.3d 36, 44 (1st Cir. 2001)) (internal quotation marks omitted)); *Wyman*, 335 F.3d at 94 ("Where a law is on its face viewpoint neutral . . . but has a differential impact among viewpoints, the inquiry into whether the law is in fact viewpoint discriminatory turns on the law's purpose.").

Where, as here, the government policies are themselves viewpoint-neutral but in tandem create a disparate impact, plaintiffs must show that the policies were brought together for the purpose of discriminating against or in favor of a particular viewpoint. *See Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) ("Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner."); *McGuire*, 386 F.3d at 61 (describing plaintiffs' as-applied challenge as contending "that the law itself is neutral and constitutional . . . , but that it has been enforced selectively in a viewpoint discriminatory way"); *Oney v. Okla. City*, 120 F.2d 861, 865–66 (10th Cir. 1941) ("But an ordinance apparently valid on its face may be construed and applied in such a manner as to bring it within the prohibitions

of the Fourteenth Amendment." (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373, 374 (1886))).  Plaintiffs might show, for example, that different officials agreed to work collaboratively to execute their respective policies or to take certain actions—each viewpoint-neutral in isolation—with the intent of disadvantaging some message or speaker.  *See Brooks v. Gaenzle*, 614 F.3d 1213, 1227–28 (10th Cir. 2010) (stating that, to establish a conspiracy under § 1983, plaintiffs must show "a combination of two or more persons acting in concert and . . . a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective," but cautioning that "[p]arallel action—or inaction . . . —does not necessarily indicate an agreement to act in concert" (quoting *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004)) (internal quotation marks omitted)).

Furthermore, because this case arises in the *Bivens* and § 1983 context, plaintiffs must show that "each defendant" harbored a discriminatory purpose.  *See Dodds*, 614 F.3d at 1200.  Thus, even if it is reasonable to infer that one public official acted with discriminatory intent, it does not necessarily follow that another official did so as well. *See Iqbal*, 556 U.S. at 677 ("In the context of determining whether there is a violation of clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities."); *Dodds*, 614 F.3d at 1194 ("[A]n allegation that Defendant A violated a plaintiff's clearly established rights does nothing to overcome

Defendant B's assertion of qualified immunity, absent some allegation that Defendant B was responsible for Defendant A's conduct." (quoting *Hope*, 536 U.S. at 751 n.9 (Thomas, J., dissenting)) (internal quotation marks omitted)).  Nor can the inference of discriminatory intent be drawn by aggregating one or more officials' actions and simply pointing to the discriminatory effect thereof.  *See Tonkovich*, 159 F.3d at 532.  This is especially true when officials are employed by different government sovereigns and each acts consistently with his or her own agency's viewpoint-neutral policy.  *Cf. United States v. Uribe-Rios*, 558 F.3d 347, 356 (4th Cir. 2009) ("[F]undamental principles of dual sovereignty do not allow us to impute the knowledge of state officials to federal officials.").

It is this discriminatory-purpose requirement that dooms plaintiffs' case against Special Agent Sheehan, Lt. Thomas, and Sgt. Mims.  Even taking all of the district court's (legally well-grounded) factual determinations as true and granting plaintiffs all reasonable inferences in their favor, they do not demonstrate a constitutional violation—i.e., that any defendant acted, or implemented his agency's policy, for the purpose of discriminating against plaintiffs' anti-Bush message or in favor of the supporters' pro-Bush message.[9]

---

[9]    For purposes of this entire discussion, we use the terms "purpose," "intent," and "motive" interchangeably to describe the subjective motivations of defendants in this case.  We recognize that there may be subtle distinctions between these terms in some contexts.  In the First Amendment viewpoint-discrimination context, however, they are materially identical.  *See, e.g.*, *Iqbal*, 556 U.S. at 676–77 (using the terms "purpose" and
(continued...)

**2**

We start with Special Agent Sheehan. The district court found no evidence that Special Agent Sheehan was personally involved in implementing BCSD's move-south policy. In particular, there is "no evidence that [he] specifically ordered local law enforcement to forbid protestors from moving north to private property or to force protestors south from the public shoulder across from the Mayor's driveway." Sheehan App. at 220. Nor is there any evidence that, in the days leading up to the President's visit, Special Agent Sheehan participated in establishing BCSD's move-south policy. Rather, the decision to direct demonstrators to the southern checkpoint was Lt. Thomas's and Sgt. Mims's alone. *See Lukumi*, 508 U.S. at 540 (stating that "the specific series of events leading to the enactment or official policy in question . . . bear[s] on the question of discriminatory object"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("The specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes.").

The only connection between Special Agent Sheehan and BCSD's move-south policy was his attendance at Sgt. Mims's morning briefing, where Sgt. Mims instructed local officers to push demonstrators south. The district court thought, and plaintiffs contend, that this is enough to permit a reasonable inference that Special Agent Sheehan acted for a viewpoint-discriminatory purpose—specifically, that he later allowed Bush

---

[9](...continued)
"intent" interchangeably); *see also Grossbaum*, 100 F.3d at 1292 n.3.

supporters to remain on private property north of the southern checkpoint because he favored their message and disfavored that of plaintiffs. We disagree.

"[P]urposeful discrimination requires more than . . . intent as awareness of consequences." *Iqbal*, 556 U.S. at 676 (quoting *Feeney*, 442 U.S. at 279) (internal quotation marks omitted). It follows, under this standard, that if the evidence shows only that a defendant is aware of disparate treatment of two similarly situated groups—but nothing more—then a § 1983 or *Bivens* claim for viewpoint discrimination must fail as a matter of law. *See Feeney*, 442 U.S. at 278–80 (ruling that plaintiff failed to prove discriminatory purpose, even though legislature was aware that the challenged law would have a disparate impact); *SECSYS, LLC v. Vigil*, 666 F.3d 678, 690 (10th Cir. 2012); *see also Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2717–18 (2010) (distinguishing between "knowledge" and "intent" in the context of a First Amendment challenge to a criminal statute); *Giles v. California*, 554 U.S. 353, 368 (2008) ("[T]hat knowledge is sufficient to show intent is emphatically *not* the modern view."); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 731 (4th ed. 2011) ("[*Feeney* held that] it is not enough to prove that the government took an action with knowledge that it would have discriminatory consequences" and "essentially . . . adopted a criminal law definition of intent meaning the desire to cause those results."). Put differently, a reasonable jury cannot infer discriminatory purpose from evidence showing awareness of consequences alone. For a plaintiff to succeed, there must be additional evidence—direct or circumstantial—that the defendant acted "for the purpose of discriminating on account

of" viewpoint. *Iqbal*, 556 U.S. at 677.

That standard has not been met with respect to Special Agent Sheehan. All that his attendance at Sgt. Mims's morning briefing shows is that he was aware that BCSD officers would be enforcing the move-south policy and that this policy did not draw a distinction between public and private property. The most that we or a reasonable jury could say, then, is that when Special Agent Sheehan allowed supporters to remain on private property north of the southern checkpoint, he was aware that a disparate impact would result from his decision. That is not enough to vault plaintiffs over the hurdle of Special Agent Sheehan's qualified immunity.

We think any inference of viewpoint discrimination is further weakened by the fact that Special Agent Sheehan's decision was consistent with his own agency's facially viewpoint-neutral policy. When a law or policy, though facially legitimate, is selectively enforced or subject to exceptions, it may suggest that content or viewpoint discrimination is afoot. *See Gilleo*, 512 U.S. at 52 (noting that "[e]xemptions from an otherwise legitimate regulation of a medium of speech" increase the "risks of viewpoint and content discrimination" and "may diminish the credibility of the government's rationale for restricting speech"); *Taxpayers for Vincent*, 466 U.S. at 816 ("To create an exception for appellees' political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination.").

Indeed, an inference of viewpoint discrimination might be stronger here if Special Agent Sheehan's decision allowing supporters to remain on private property represented a

deviation from Secret Service policy. *See Arlington Heights*, 429 U.S. at 267

("Departures from the normal procedural sequence . . . might afford evidence that

improper purposes are playing a role."); *Buck v. City of Albuquerque*, 549 F.3d 1269,

1280 (10th Cir. 2008) (ruling that evidence was sufficient to show APD official's

personal, direct involvement in unconstitutional arrests in part because he "deviated from

the APD's general policy"); *cf. Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1138

n.11 (10th Cir. 2008) (noting that "disturbing procedural irregularities, including

deviations from normal company procedure, provide support for a plaintiff's assertion"

that an employer acted with discriminatory intent (quoting *Garrett v. Hewlett-Packard*

*Co.*, 305 F.3d 1210, 1219–20 (10th Cir. 2002)) (internal quotation marks omitted));

*United States v. Martinez*, 983 F.2d 968, 972 (10th Cir. 1992) ("[T]o show pretext [in the

Fourth Amendment context], the law enforcement officer must deviate from his usual

practice." (quoting *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir. 1990))

(internal quotation marks omitted)). The inference would be stronger, too, if there were a

"pattern of unlawful favoritism." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002).

None of these circumstances suggestive of a discriminatory motive are present in this

case. Indeed, to the contrary, because Special Agent Sheehan's decision was in line with

Secret Service policy, and because that policy was itself legitimate, this tempers any

inference of a discriminatory motive. *See Feeney*, 442 U.S. at 279 n.25.[10]

---

[10]     Another strong case for discriminatory intent might have been made if in
fact Special Agent Sheehan had some opportunity that morning to accord equal treatment
(continued...)

The district court thought an inference of discriminatory intent could be drawn because "Defendants" (a term that included Special Agent Sheehan) "ha[d] proffered no legitimate reason as to why the anti-Bush protestors could not stand near the pro-Bush supporters on the adjacent public shoulder." Sheehan App. at 214. But no inference of discriminatory intent can be made on that basis.

The First Amendment does not impose upon public officials an affirmative duty to ensure a balanced presentation of competing viewpoints. *See Husain v. Springer*, 494 F.3d 108, 130 (2d Cir. 2007). To the contrary, freedom of speech is a negative liberty. The First Amendment is a restriction on the government's power to "abridg[e]" speech, U.S. Const. amend. I, not a source of government power—much less a mandate—to orchestrate public discussion. *See Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012) ("The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves. And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may

_____

[10](...continued)
to both protesters and supporters and then failed to do so. *See Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 122 (5th Cir. 1992) (rejecting First Amendment challenge to university regulation that gave university official discretion to designate certain areas of campus for placement of newsstands because "[o]nce such areas have been designated, . . . any newspaper could place its stand in the area without further approval" and the "regulation provides no opportunity to discriminate among different publications"); *Bronze Shields, Inc. v. N.J. Dep't of Civil Serv.*, 667 F.2d 1074, 1087 (3d Cir. 1981) ("To prove intentional discrimination, the *opportunity* to discriminate must be shown to have been exploited." (emphasis added)). But Special Agent Sheehan never had any such opportunity. Indeed, the evidence does not show any contact whatsoever between him and protesters that morning.

not be curtailed." (citations omitted)); *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) ("[A]s a general matter, the First Amendment means that government has no power to restrict expression . . . ." (alteration in original) (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)) (internal quotation marks omitted)); *Cohen v. California*, 403 U.S. 15, 24 (1971) ("[The First Amendment] is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us . . . ."); *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 319 (6th Cir. 1998) ("[T]he First Amendment only protects individuals' 'negative' rights to be free from government action and does not create 'positive' rights—requirements that the government act." (quoting Bradley A. Smith, *Money Talks: Speech, Corruption, Equality, and Campaign Finance*, 86 Geo. L.J. 45, 67 (1997)) (internal quotation marks omitted)). Special Agent Sheehan's decision to allow Bush supporters to remain on nearby private property did not impose upon him a corresponding duty to relocate Bush protesters to a more favorable location. Accordingly, his failure to do what the First Amendment does not require of him cannot give rise to an inference of viewpoint discrimination.

The most that the evidence shows with respect to Special Agent Sheehan is that he *knew* his actions, though consistent with Secret Service policy, would, in conjunction with the independent actions of BCSD officials, result in disparate treatment of supporters and protesters. This is legally insufficient to establish viewpoint discrimination, and we must reverse the district court's denial of qualified immunity to Special Agent Sheehan.

**3**

We turn next to Lt. Thomas.  Sometime during the course of enforcing the move-south policy that morning, he learned of Special Agent Sheehan's decision with respect to the Bush supporters.  His response was "Fine."  Sheehan App. at 204.  He did not alter the move-south policy in response to Special Agent Sheehan's actions.  The district court thought a reasonable jury could infer that Lt. Thomas harbored a discriminatory purpose because he possessed responsibility for the move-south policy but "knowingly acquiesced in the decision not to interfere with the pro-Bush supporters who remained on or near their private property during the event."  *Id.* at 218.  We must disagree with the district court.

There is no evidence that Lt. Thomas had any hand in Special Agent Sheehan's decision to allow supporters to remain north of the southern checkpoint on private property.  The only activity that connects Lt. Thomas to that decision is his knowledge of and acquiescence in it.  That, however, is plainly insufficient to allow a reasonable jury to infer a discriminatory purpose.  The most that the evidence shows with respect to Lt. Thomas is that he became aware that the actions of a different official—one who was not in his chain of command and, indeed, worked for a separate sovereign—would, in conjunction with his own policy, result in disparate treatment of the Bush protesters.  But Lt. Thomas's "awareness of consequences," as a matter of law, does not suffice to show that he promulgated or implemented the move-south policy for a discriminatory purpose. *Iqbal*, 556 U.S. at 676 (quoting *Feeney*, 442 U.S. at 279) (internal quotation marks

omitted).

Furthermore, as with Special Agent Sheehan, any inference that Lt. Thomas acted for a discriminatory purpose is made weaker by the consistency between his actions and BCSD policy. *See Bloedorn v. Grube*, 631 F.3d 1218, 1237 (11th Cir. 2011); *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1151 (10th Cir. 2001); *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1288–89 (10th Cir. 1999). Indeed, the reasonableness of such an inference nears the vanishing point when one considers that Lt. Thomas had promulgated and was implementing the move-south policy *before* Special Agent Sheehan's decision regarding the Bush supporters and continued to implement the policy thereafter.

The district court thought that a jury could infer Lt. Thomas's discriminatory motives because he could have allowed protesters to "stand near the pro-Bush supporters on the adjacent public shoulder." Sheehan App. at 214. In essence, the district court reasoned that, to foreclose an inference of viewpoint discrimination, public officials must permit exceptions to their otherwise viewpoint-neutral policies to avoid a disparate impact. We think that turns traditional First Amendment principles on their head.

Traditionally, it is the *exceptions* to otherwise legitimate policies that raise content- and viewpoint-neutrality problems, not the other way around. *See Gilleo*, 512 U.S. at 52; *Taxpayers for Vincent*, 466 U.S. at 816; *Corales v. Bennett*, 567 F.3d 554, 567 (9th Cir. 2009) ("[G]ranting Plaintiffs an exemption to the otherwise generally applicable rule would cast suspicion on the Constitutionality of the rule itself, because it would no longer

be content-neutral in application." (citing *Carey v. Brown*, 447 U.S. 455 (1980))); *see also United States v. Albertini*, 472 U.S. 675, 688 (1985) ("The First Amendment does not bar application of a neutral regulation that incidentally burdens speech merely because a party contends that allowing an exception in the particular case will not threaten important government interests."). The First Amendment did not require Lt. Thomas to make an exception to the move-south policy in response to Special Agent Sheehan's (independent) decision. Furthermore, as we discussed in connection with Special Agent Sheehan, the First Amendment does not impose upon public officials an affirmative duty to ensure a balanced presentation of competing viewpoints. *See Husain*, 494 F.3d at 130. Accordingly, we would be hard-pressed to infer discriminatory motive from Lt. Thomas's failure to permit the Bush protestors to stand on the adjacent public shoulder near the Bush supporters, in contravention of BCSD's move-south policy.

Of course, it is true that, once Special Agent Sheehan allowed the Bush supporters to remain north of the southern checkpoint, Lt. Thomas did not apply the move-south policy to them. But that consequence flowed from Special Agent Sheehan's decision (and in turn from Secret Service policy) and did not derive from a policy over which Lt. Thomas had supervisory control. *See Tonkovich*, 159 F.3d at 532 (noting the need for attention to defendants' "different powers and duties" in the § 1983 context). Special Agent Sheehan was not Lt. Thomas's subordinate or vice-versa, and nothing in law or in fact imposed responsibility upon Lt. Thomas for Special Agent Sheehan's actions. *Cf. Dodds*, 614 F.3d at 1203 ("Oklahoma law made Defendant responsible for the policies

that operated and were enforced by his subordinates at the jail.").

Even more importantly, we can perceive no basis, in the First Amendment or otherwise, for requiring Lt. Thomas to override Special Agent Sheehan's decision. We will not require local law enforcement officers to go head to head with Secret Service agents in order to avoid § 1983 liability, especially when all are engaged in a joint effort to protect the President. *See Watts v. United States*, 394 U.S. 705, 707 (1969) ("The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive."); *see also Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ("[The qualified immunity standard's] accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued. Our national experience has taught that this principle is nowhere more important than when the specter of Presidential assassination is raised." (quoting *Davis v. Scherer*, 468 U.S. 183, 196 (1984)) (internal quotation marks omitted)); *see also Reichle*, 132 S. Ct. at 2097 (Ginsburg, J., concurring in the judgment) ("Officers assigned to protect public officials must make singularly swift, on the spot, decisions whether the safety of the person they are guarding is in jeopardy.").

Nor do we attach any legal significance to the fact that Lt. Thomas subsequently stationed several law enforcement officers in front of the group of supporters after Special Agent Sheehan permitted them to stay. The district court thought that this action undercut the security and manpower rationales advanced for the move-south policy and suggested pretext. *See* Sheehan App. at 214, 216. We disagree. *See Weaver v. Chavez*,

458 F.3d 1096, 1101 (10th Cir. 2006) ("[T]he 'rule of independent review' assigns to th[is] court the job of evaluating the ultimate constitutional significance of the facts." (quoting *Bose*, 466 U.S. at 501) (internal quotation marks omitted)). The move-south policy was established by BCSD before the day's events unfolded. The fact that BCSD staffing levels could accommodate an exception to the policy—that was made independently by an official of a separate agency, working for a separate sovereign—does not undercut the policy's basic purposes or content neutrality. *See Citizens for Peace in Space*, 477 F.3d at 1219, 1220 (recognizing the content neutrality of restricted-zone speech ban, even though the evidence showed staffing levels adequate to permit exceptions for plaintiffs' and others' demonstrations); *see also Albertini*, 472 U.S. at 688. Accordingly, in our view, these facts do not implicate Lt. Thomas in viewpoint discrimination. If anything, his stationing of officers in front of supporters *reinforces* his proffered security concerns, and also tended to equalize treatment of supporters and protesters; recall, the latter were compelled to stand behind a barricade, comprised in part of horse-mounted officers.

The most that the evidence shows with respect to Lt. Thomas is that he *knew* his continued enforcement of the move-south policy would, in conjunction with the independent decision of Special Agent Sheehan, result in disparate treatment of supporters and protesters. This is legally insufficient to establish viewpoint discrimination; accordingly, we must reverse the district court's denial of qualified immunity to Lt. Thomas.

**4**

The facts with respect to Sgt. Mims are identical in all material respects to the facts with respect to Lt. Thomas. As with Lt. Thomas, the district court predicated Sgt. Mims's personal liability for viewpoint discrimination on the fact that he possessed responsibility for the move-south policy and that he "knew of and did not interfere with the pro-Bush supporters' demonstration across from the Mayor's driveway." Sheehan App. at 220. But Sgt. Mims did not personally participate in Special Agent Sheehan's decision and was not responsible for it in a supervisory capacity. His mere knowledge of and acquiescence in that decision are insufficient as a matter of law to amount to a viewpoint-discriminatory purpose. *See Iqbal*, 556 U.S. at 676–77; *Feeney*, 442 U.S. at 278–80. And because the First Amendment neither required Sgt. Mims to make an exception to the move-south policy in response to Special Agent Sheehan's decision nor required him to override that decision, Sgt. Mims's inaction in the face of the disparate treatment of plaintiffs cannot give rise to an inference of discriminatory intent. We therefore reverse the district court's denial of qualified immunity to Sgt. Mims.

**IV**

The district court's judgment is **REVERSED**. The case is **REMANDED** with instructions to the district court to enter summary judgment on the grounds of qualified immunity in favor of Special Agent Sheehan, Lt. Thomas, and Sgt. Mims.

# Appendix

Satellite image of the presidential visit site
Los Ranchos de Albuquerque, New Mexico



Underlying imagery and map data © 2012 Google

Labels and lines in red added by the Court